### ATLANTIC COAST LINE R. CO. v. SELDEN. *

(Circuit Court of Appeals, Fourth Circuit. January 19, 1918.)

#### No. 1559.

MASTER AND SERVANT ☜278(18)—ACTION FOR INJURY TO SERVANT—SUFFICIENCY OF EVIDENCE.

    A verdict finding a railroad company chargeable with negligence and liable for the death of a switchman, who was struck by a train moving backward at night on the main track through the yard, *held* not supported by the evidence under the instructions of the court, although plaintiff was entitled to more favorable instructions.

In Error to the District Court of the United States for the Eastern District of Virginia, at Richmond; Edmund Waddill, Jr., Judge.

Action at law by Jennie C. Selden, administratrix of John R. Selden, deceased, against the Atlantic Coast Line Railroad Company. Judgment for plaintiff, and defendant brings error. Reversed.

Edwin P. Cox, of Richmond, Va., and Bernard Mann, of Petersburg, Va., for plaintiff in error.

Brockenbrough Lamb, of Richmond, Va. (Keith & Hurt and Lamb & Lamb, all of Richmond, Va., on the brief), for defendant in error.

Before PRITCHARD and WOODS, Circuit Judges, and CONNOR, District Judge.

PRITCHARD, Circuit Judge. This action was instituted in the District Court of the United States for the Eastern District of Virginia by defendant in error, administratrix of her deceased husband, against the Atlantic Coast Line Railroad Company, plaintiff in error, to recover damages for the death of her husband. The deceased was employed by the Atlantic Coast Line Railroad Company as a yard

switchman, and was killed while performing his duties as such on the company's yard, which is known as "the South Richmond yard." This action was instituted under what is known as the federal Employers' Liability Act (Act April 22, 1908, c. 149, 35 Stat. 65 [Comp. St. 1916, §§ 8657–8665]), and it is conceded that the act in question applies to the case at bar.

The company's main line runs from Byrd Street station, on the north side of the James river, in the city of Richmond, Va., in a southwesterly direction over a bridge across the river, and then turns and proceeds in a southerly direction. The South Richmond yard is located on the south side of the river, a short distance beyond the end of this bridge, and through this yard the main track runs in a sharp curve, upon the inside of which and close to the main line is an embankment more than 30 feet high. There is but one track, called for convenience the storage track, between the main line and this embankment. On the other side of the main line track, (on the outside, or convex, of the curve) there are 12 tracks, all of which run upon approximately the same curve, parallel to the main track, which tracks are in the yard. The limits of this yard may be roughly said to be a footbridge over the tracks at the northern end, and Semmes avenue bridge, which carries Semmes avenue and the street car tracks over the railroad, at the southern end. North of this footbridge the railroad is a single track to Byrd Street station, and south of Semmes avenue bridge there are 3 tracks for a distance of some miles. The distance from Semmes avenue bridge to the footbridge is 976 feet.

It appears that at the time deceased was killed he was engaged in shifting a train of cars which were moving in a southerly direction on the track next to and just west of the main line track, viz., the first track on the outer side of the curve formed by the main line track; that the cars with which the deceased was engaged were running on track No. 5. It further appears that deceased was temporarily in charge of this operation; the regular conductor having gone a few moments before to the yard office for orders. The duties of the deceased required him to be on the inner side of this train, the main line side, in order for his signals to be properly transmitted. The locomotive had been attached to the cars on the track No. 5— had been coupled to them by the deceased—and they had begun to move in a southerly direction out of track No. 5, and as soon as this movement began deceased walked northwardly, as plaintiff contends, along the main line track for the purpose of noting the chalk marks on the cars, in order that they might be switched to their proper locations. It is also insisted that the deceased, for his own protection, walked in the middle of the main line track; that the space between the main line track and No. 5 was not a safe place to walk, because of the danger of swinging doors and projections on the cars on track No. 5, as well as the danger from the roughness and unevenness of the ground and the projection of exposed tie ends, all of which rendered the main line track the safest place for him to walk.

It is insisted that while thus engaged with the cars on track No. 5 deceased was, without warning, struck and killed by a train of 34

cars which approached him from the rear on the main line; that the train which struck him was coming northwardly towards Richmond, and that the same was being pushed by a locomotive from the rear around this curve and embankment. It appears that there was no light ·upon the leading box car, and it is contended that no warning of any kind was given of the approach of the train. It also appears that owing to the method of running this train the engineer was about 1,400 feet from the leading car, and therefore had no view whatever of the track ahead of his train; such view as he might have had being entirely cut off by the curve in the embankment.

It further appears that this north-bound train was in charge of Conductor Jones, who was standing on the top of the leading box car, about midway thereof. It is admitted that it was the duty of Jones to keep a lookout on the track, and to warn employés in danger of being struck by this train, and to relay to the engineer such signals as might be required. On account of the length of the train, the signals had to be relayed from the conductor on the leading box car to a brakeman about the middle of the train, who in turn repeated the signals to another brakeman near the locomotive, who repeated them to the engineer.

As the leading car of this north-bound train entered the yard under Semmes avenue bridge, the conductor was able to see and did see a signal light a considerable distance north of the footbridge, and this signal light indicated a clear track and gave him his clearance through to Richmond. When this signal was seen, the leading car was not less than 650 feet south of the point where deceased was struck. The only duty that Conductor Jones had to perform while his train was running this distance, as shown by his own testimony, was to look out for and warn with his voice employés engaged in the yard and in danger of being struck by his train. A great number of employés were customarily at work on this yard at night, passing to and fro across and along the main track.

The deceased was run down and killed, and the noise of the breaking of his lantern was the only thing that gave warning of the accident to the colored brakeman, John Montgomery, who was engaged with Capt. Selden's crew and was walking northwardly along the main line some distance north of Capt. Selden. The noise of the breaking glass attracted the attention of Montgomery, who testified that he looked around and saw the silent, unlighted bulk of the leading car bearing down upon him out of the darkness, and that he barely escaped with his life by jumping from the main line track.

Conductor Jones, a witness for the plaintiff, who, as we have stated, was standing near the center of the leading car, said that when he "got his signal to proceed he gave the signal to go ahead to the man in the middle of the cut of cars on which he was, so that that man could give it to the man next to the engine, and that after he gave the signal he was standing in the same position on the car, looking straight ahead, and that he did not see anything on the track."

A number of witnesses were introduced, but we think that this statement covers the facts material to the question before us, in view of the charge of the court below. The jury found a verdict in favor

of the plaintiff, and judgment was entered accordingly, to which defendant excepted. The case now comes here on writ of error.

The court below, among other things, gave the following instruction:

"(6) The court instructs the jury they cannot find a verdict for the plaintiff in this case, unless it has been shown to their satisfaction by the greater weight of evidence that Mr. Selden was, at the time of the accident, walking on the main line track, and not between the track and No. 5, and that Conductor Jones saw and knew that he was in a position of danger, or by the exercise of ordinary care and caution ought to have seen him on said track, and to have known, that he was in a position of danger, and that after he had such knowledge or opportunity of knowledge there was sufficient time for the defendant company, acting through its train crew on the cut of cars going north, to have prevented the accident."

In granting this instruction the court excluded all other theories involved in this case, only submitting to the jury the issue whether Conductor Jones had an opportunity to see Selden's danger and warn him of the approaching train; the negligence of Selden being assumed. Therefore, in determining the point involved, we must confine ourselves to the evidence which relates to the question as to whether the defendant company complied with the rule or custom which requires that in making a yard movement a conductor or other person assigned to that duty should stand at the center of the leading car with a lantern to warn those who might be on the track of the approaching train.

Conductor Jones, whose evidence was not contradicted, stated, among other things, that he was on the car at the proper place and that his lantern was in good condition, which afforded him an opportunity to have a clear view of the track in front of the moving train, and that he did not see deceased until after the accident occurred. This witness also testified that this was a custom of long standing in the operation of trains in the vicinity where the accident occurred; that plaintiff's decedent had, on many occasions, performed the same service and in precisely the same manner. Other witnesses corroborated the testimony of Conductor Jones as respects this point. Indeed, a careful search of the record fails to disclose any evidence tending to show that Jones was in any way negligent in performing the duty required of him. Under these circumstances we fail to see how the jury, restricted as it was by the instructions submitted, could have found that decedent's death was due to the negligence of the defendant or any of its employés.

However, we think that the proof shows that the movement in question was a main line movement. It appears from the evidence that the rules of the defendant company, among other things, provide:

"Rule 24. When cars are pushed by an engine (except when shifting or making up trains in yards) a white light must be displayed on the front of the leading car by night."

This rule is eminently proper, providing as it does that when cars are being pushed by an engine that a white light must be displayed on the front of the leading car as a warning of its approach. When trains are operated in the regular way, the engine precedes the cars

and is equipped with a powerful light, which serves a two-fold purpose, to wit: (1) To enable the engineer at all times to have a clear' view of the tracks in front of him; and (2) to indicate to those who may be on or about the tracks the approach of the train, but in this instance, as we have stated, the train was being pushed backwards and going at a rate of speed which did not create much noise, and there being no light on the end of the leading car rendered this method of operation exceedingly hazardous to those who might be walking upon the main line track.

In view of this phase of the case, the plaintiff was entitled, if he had so requested, to have the jury pass upon the question as to whether the defendant company was guilty of negligence in operating a train on the main line without placing a light on the front of the leading car, subject to the defense of assumption of risk.

From what we have said, it follows that the judgment of the court below should be reversed, and the cause remanded, with instructions to proceed in accordance with the views expressed herein.

Reversed.